1
2
3
4                       UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7    KOSAL K. KHEK,                        Case No.  14-cv-02936-EMC

8                    Petitioner,

9            v.                            ORDER DENYING PETITION FOR
                                           WRIT OF HABEAS CORPUS
10   FRED FOULK,

11                   Respondent.

12

13                      I.      **INTRODUCTION**

14          Kosal Kim Khek filed this *pro se* action for a writ of habeas corpus pursuant to 28 U.S.C. §

15   2254 to challenge his murder conviction.  Respondent has filed an answer to the petition and Mr.

16   Khek has filed a traverse.  For the reasons discussed below, the Court dismisses one claim as

17   untimely filed and denies the other claim on the merits.

18                      II.     **BACKGROUND**

19          The California Court of Appeal described the facts of the crime:

20          Viet Society (VS) and Strictly Family (SF) are rival criminal street gangs in San
            Jose. Defendants [Kosal Kim Khek and Christopher Lee] are VS members.
21

22          On August 29, 2007, SF gang members drove to and stopped at the Magic Sands
            Mobile Home Park where several of defendants' friends were sitting on the grass
23          near a swimming pool. One of the friends, Tuan Nguyen, began arguing with a
            passenger in the SF car, and the passenger pulled out a gun and shot Nguyen three
24          times. Another of the friends recognized the shooter and identified him to the
            police. Another friend described the car and a partial license plate number to the
25          police. The police arrested the shooter and owner of the car for attempted murder.

26          When defendants found out about the shooting, they began to plot revenge against
            SF via computer instant messaging. For example, Lee told Khek that he was going
27          to find out where the shooter lived and added: "Oh yeah. I found out that this
28

United States District Court
For the Northern District of California

Anthony [Nguyen] kid from Andrew Hill [High School] lives with Johnny.... [¶] ... [¶] ... We start by taking them out one by one. [¶] ... [¶] ... Just hit them up. Let's kill this Anthony kid from A Hill. He's a kid, too, just like Tuan. Eye for an eye." And Khek told Lee: "How does that Anthony kid look like? I am going to fuck his ass up. [¶] ... [¶] And run away like an assassin. [¶] ... [¶] And he won't know who hit him." Lee later sent pictures of Anthony Nguyen to Khek, and Khek told Lee that "I'm going to get him after school so maybe at 3:00."

On September 6, 2007, Anthony Nguyen, Phong Nguyen, Kim Huynk, Lily Phong, and Kevin Huynh were smoking and talking outside a laundromat and the Q–Cup café. Khek walked up to Anthony Nguyen and asked whether he was Anthony. When Anthony Nguyen affirmed that he was Anthony, Khek stabbed him twice and ran away. Anthony Nguyen died at the scene from massive bleeding. One of the stab wounds penetrated his shoulder; the other wound penetrated his stomach four and a half inches, cut through the liver and aorta, and caused six to 12 inches of bowel to protrude from the body. Phong Nguyen and Kim Huynk identified Khek to the police. Police obtained an arrest warrant for Khek, determined that he was on probation with a search condition, arrested him at his apartment, and seized his computer. A witness linked Anthony Nguyen to Lee, and the police determined that Lee was on juvenile probation with a search condition. The police went to Lee's residence, conducted a probation search, and seized Lee's computer.

Cal. Ct. App. Opinion, pp. 2-3 (alterations other than first bracketed material, and omissions, in original).

### III.   JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Santa Clara County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

### IV.   STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application

United States District Court
For the Northern District of California

of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

## V.   DISCUSSION

A.   Exclusion of Mr. DeJong's Statement That The Plan Was To Hurt But Not Kill The Victim

   1.   Background

Mr. Khek contends that his federal constitutional rights to compulsory process and due process were violated by the trial court's exclusion of "exculpatory evidence" that Robert DeJong (a fellow gang member) "had told the police that the plan was to hurt Nguyen, but not to kill him." Docket No. 1 at 9. Mr. Khek argues that the exclusion of the evidence interfered with his presentation of "relevant evidence demonstrating that he was not guilty of first degree murder," and was contrary to the Supreme Court's rulings that "technical evidentiary rules cannot be relied upon by trial courts to deny an accused citizen the opportunity to present legitimate exculpatory evidence." *Id.* at 9, 12 (citing *Crane v. Kentucky*, 476 U.S. 683 (1986), and *Chambers v.*

United States District Court
For the Northern District of California

*Mississippi*, 410 U.S. 284 (1973)).[1]

The evidence in question consisted of statements made by Mr. DeJong to the police in an interview a week after the killing.[2]  The context in which Mr. DeJong had made the statements and the statements sought to be admitted were as follows:

> DeJong first told the police that he had been sleeping at his home at the time of the murder. He then told them that he had left home near the time of the murder to deliver a friend's backpack to school. Later in the interview, he denied ever going to the Q-Cup café and offered that he had learned of a killing at the Q-Cup from his girlfriend. After taking a break, the police told DeJong that they were investigating Anthony Nguyen's murder at the Q-Cup; did not believe DeJong; and wanted to hear the truth from DeJong. DeJong then admitted that he went to the Q-Cup after dropping off the backpack. Before continuing, the officers revealed that they knew what had happened and cautioned DeJong against lying. DeJong then admitted being at the Q-Cup with Khek.

> Defendants proffered the following statements from the interview for admission into evidence.

> 1. "We were driving to Q-Cup. We weren't planning it—this—there wasn't any plan it was just supposed to be, you know. We weren't—we weren't about to do it—or he wasn't—but then...."

> 2. "And we walked back close to my car and we didn't know if we should do it ... and then, fuck, I don't know, I took him back home to his house."

> 3. [Question: What was the plan? How were you going to hurt him?] "Either jump him and if you were gonna use a weapon, use, not that, not too muc[h] 'cause we didn't want him to die. Just stab him once, twice middle of the stomach and that was it. But I guess he got him in the neck too."

> 4. "Go to his house, stab him, and walk—walks away. [¶] ... [¶] That was plan 2."

> 5. [Question: Who came up with the stabbing plan, you, [Vinh] Ly, and Khek. How 'bout [Lee]?] "No, he wasn't—he wasn't in [the car]."

---

[1] Khek also argues that the exclusion of the evidence was improper under the California Evidence Code.  Federal habeas relief is not available for such state law errors.  *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

[2] DeJong, who was *not* tried with Khek, invoked his Fifth Amendment privilege not to incriminate himself and did not testify.

6. [Dialogue to the effect that DeJong, Khek, and Ly drove back to Khek's home and Lee was already there harboring the belief that the plan had been to jump Anthony Nguyen.]

Cal. Ct. App. Opinion at 8-9 (alternations and omissions in original).

The California Court of Appeal rejected Mr. Khek's state law and federal constitutional challenges to the exclusion of the evidence.  As to the state law claims, the California Court of Appeal concluded that Mr. DeJong's statement that the plan was only to hurt the victim was not admissible under the hearsay exception for declarations against penal interest.  Whether the declaration against penal interest exception applies depends on the context in which the statement is made, and the "trial court could have rationally concluded that DeJong's statements were exculpatory or self-serving and untrustworthy because DeJong lied to the police and, when caught in the lie, sought to minimize his culpability by posing an assault-gone-awry scenario." *Id.* at 11-12.  The trial court's exercise of its discretion was "entirely consistent with the case law for determining the declaration-against-interest exception to the hearsay rule." *Id.* at 12.

The California Court of Appeal also determined that Mr. Khek's constitutional claims were "without merit." *Id.* at 12.  The evidence had been determined to be unreliable by the trial court, and its exclusion pursuant to the application of ordinary rules of evidence did not violate Mr. Khek's right to present a defense or his right to due process. *Id.* at 12.  *Chambers* did not help Mr. Khek because in *Chambers*, "the court overturned a state court's application of its hearsay rule because it excluded evidence made under circumstances that provided considerable assurance of the evidence's reliability. . . . Here, defendants cannot complain of a denial of due process because the hearsay evidence they sought to introduce was unreliable."  Cal. Ct. App. Opinion, at 12-13 (citing *Chambers v. Mississippi*, 410 U.S. at 298-302).

2.    Analysis

The U.S. Constitution gives a criminal defendant the right to present a defense.  "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476

United States District Court
For the Northern District of California

1    U.S. 683, 690 (1986) (citations omitted).  The Compulsory Process Clause of the Sixth

2    Amendment preserves the right of a defendant in a criminal trial to have compulsory process for

3    obtaining a favorable witness.  *Washington v. Texas*, 388 U.S. 14, 19 (1967).  The Sixth

4    Amendment right to present relevant testimony "may, in appropriate cases, bow to accommodate

5    other legitimate interests in the criminal trial process."  *Chambers v. Mississippi*, 410 U.S. 284,

6    295 (1973); *Taylor v. Illinois*, 484 U.S. 400, 410-11 (1988) (right to compulsory process is not

7    absolute); *cf. Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (plurality opinion) (defendant

8    "'does not have an unfettered right to offer [evidence] that is incompetent, privileged or otherwise

9    inadmissible under standard rules of evidence'"; the exclusion of evidence does not violate the

10   Due Process Clause unless it offends some "fundamental principle of justice"). Even if the

11   exclusion of evidence was a constitutional error, habeas relief is not available unless the erroneous

12   exclusion had a "'substantial and injurious effect or influence in determining the jury's verdict.'"

13   *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

14        When crucial defense evidence that bears "persuasive assurances of trustworthiness and

15   thus [is] well within the basic rationale of the exception for declarations against interest," "the

16   hearsay rule may not be applied mechanistically to defeat the ends of justice."  *Chambers v.*

17   *Mississippi*, 410 U.S. at 302.[3]  That was not the situation here.  Mr. Khek's case was not one

18

19   _____

     [3] In *Chambers*, a third party had confessed to the murder, and later recanted.  Chambers called the
20   third party as a witness, the third party denied responsibility for the murder, and the prosecution
     established in cross-examination that the third party had recanted his confession.  Unusual and
21   outdated state law evidence rules that the defendant vouched for the third party because he had
     called him as a witness precluded Chambers from effectively questioning or cross-examining the
22   third party to impeach his recantation.  *Chambers*, 410 U.S. at 295-97; *see id.* at 296 (Mississippi's
     vouching rule has little purpose in modern criminal trials because parties generally must "take
23   [their witnesses] where they find them").  Other evidence of the third party's guilt was excluded
     because the state's declaration-against-interest exception to the hearsay rule did not apply to
24   declarations against *penal* interests.  *Chambers*, 410 U.S. at 298-300.  The hearsay statements in
     *Chambers* were made and offered at trial "under circumstances that provided considerable
25   assurance of their reliability," i.e., the confessions mere made spontaneously to a close
     acquaintance shortly after the murder; each one was corroborated by other evidence, including the
26   third party's sworn confession and testimony of eyewitnesses; each statement was self-
     incriminatory and unquestionably against the confessor's self interests; and the declarant (i.e., the
27   third party) was in court and could have been cross-examined at Chambers' trial.  *Id.* at 300-01.

28

**United States District Court**
For the Northern District of California

1   where the evidence had such persuasive assurances of trustworthiness or was within the basic

2   rationale of an exception to the hearsay rule.  The state court's determination that Mr. DeJong's

3   statement that the plan was only to hurt the victim was not trustworthy was not an unreasonable

4   determination of the facts because Mr. DeJong did not make the statement until after he tried and

5   failed to absolve himself of *all* responsibility for the crime.  As the state appellate court explained,

6   Mr. DeJong initially tried to convince the police that he was not even present at the scene of the

7   crime.  Mr. DeJong did not offer the our-plan-was-only-to-hurt-him statement until after the police

8   told him they did not believe his original statement and revealed to him that they knew what had

9   happened.  Only then did Mr. DeJong admit being at the Q-Cup with Mr. Khek and only then did

10  he say that their plan was only to hurt the victim rather than to kill him.  As the state court noted,

11  this was an attempt to minimize his guilt.  The state court determined that the evidence was not

12  trustworthy and did not fit within the exception to the hearsay rule for declarations against interest.

13  Unlike the situation in *Chambers*, there was not a statement with indicia of trustworthiness and

14  reliability that was excluded by an odd combination of unusual state evidence rules that worked

15  together to defeat the defendant's rights to due process and to present a defense.

16      Mr. Khek's other cited case, *Crane v. Kentucky*, 476 U.S. 683 (1986), also does not

17  support relief for him.  In *Crane*, the Supreme Court held that the defendant's constitutional right

18  to present a defense was violated where the state court excluded evidence using a rigid state

19  procedural rule to exclude evidence essential to the defense.  There, Kentucky had a rule that a

20  pretrial determination that a confession was voluntary was conclusive and could not be relitigated

21  at trial.  *Id.* at 686-87.  The trial court had applied this rule to exclude evidence about the

22  circumstances of the defendant's confession where the defense wanted to present the evidence to

23

24      It was the combination of the rigid application of the State's evidence rules and the fact
    that the evidence bore considerable assurances of trustworthiness and reliability that led to the due

25  process violation in *Chambers*.  *See id.* at 302-03.  The Supreme Court specifically pointed out
    that its holding did not "signal any diminution in the respect traditionally accorded the States in

26  the establishment and implementation of their own criminal trial rules and procedures."  *Id.* at 303.
    Here, by contrast, DeJong's statement that they only wanted to hurt the victim was inadmissible

27  with a routine application of the hearsay rule and did not have considerable assurances of its
    reliability such that it fit within the spirit of the hearsay rule or exceptions thereto.

28

United States District Court
For the Northern District of California

undermine the credibility of that confession.  The Supreme Court explained that the state court wrongly assumed that "evidence bearing on the voluntariness of a confession and evidence bearing on its credibility fall in conceptually distinct and mutually exclusive categories."  *Id.* at 687.  Contrary to the state court's assumption, the same evidence about the "manner in which a statement was extracted" may be relevant to both the legal question (for the judge) of the statement's voluntariness, as well as the "ultimate factual issue" (for the jury) of the defendant's guilt.  *Id.* at 688-89.  The State's "blanket exclusion of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial," by excluding "competent reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence" and without any countervailing valid state justification for its exclusion.  *See id.* at 690.

Here, there was no comparable error.  Mr. DeJong's statements about the plan to hurt the victim were not excluded by rigid use of an unrelated procedural rule, and instead were excluded with a straightforward application of the hearsay rule and the declaration against interest exception thereto.  Moreover, unlike the situation in *Crane,* the evidence being offered was not trustworthy evidence and instead was evidence determined by the state court to be lacking in trustworthiness because it was exculpatory in the context made.  That is, Mr. DeJong did not state that they had only intended to hurt the victim until the police laid out for him that they already knew what had happened and that he was involved.  *Crane* did not question "the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability--even if the defendant would prefer to see that evidence admitted."  *Id.* at 690.  California's application of the hearsay rule and the declaration against interest exception to it are not called into question by *Crane*.

Further, even if there had been a violation of the right to present a defense, any such error would have been harmless.  The instant messages exchanged between Mr. Khek and the other gang members before and after the attack plainly revealed an intent to kill and undermined the

United States District Court
For the Northern District of California

idea that this was intended only to be an assault on Anthony.[4]  The instant messages sent after someone associated with Mr. Khek's gang was shot, but before Anthony was stabbed, included the following:  On August 29 (i.e., before the September 6 killing) Mr. Lee wrote to Mr. Khek:  "'I found out that this kid Anthony from Andrew Hill [High School] lives with Johnny. . . . We start by taking them out one by one.  . . . .  Just hit them up.  Let's kill this Anthony kid from A. Hill. He's a kid, too, just like Tuan.  Eye for an eye.'"  2138-39.  Mr. Khek responded, "'What the fuck. Nah. . . . Just go after those fuckers.'"  RT 2139.  On August 30, Mr. Khek sent a message to Mr. Lee asking what Anthony looked like and asserting that he (Khek) was "'going to fuck his ass up. . . . And run away like an assassin. . . . And he won't know who hit him.'"  RT 2169.  Once Mr. Khek received a photo of Anthony on August 30, he wrote, "'Well, he's going to be on my hit list.'"  RT 2170.  On September 5, the day before the killing, Mr. Khek wrote, "'That bitch [Anthony] is going to fuckin' die.'"  RT 2209.  Hours before the killing on September 6, Mr. Khek wrote to another gang member, "'Eh, do you want to go kill a kid with me?'"  RT 2233.  The instant messages after the killing included no statement by Mr. Khek reflecting surprise, remorse or regret that he had killed the victim; instead, he sent a message that he was planning to party because he anticipated being apprehended soon.  RT 2235-36 ("'I need to party hard core.  I feel like the end is coming close'").  There also was evidence that Mr. Khek plunged the knife more than four inches into Anthony's abdomen and stabbed him in the shoulder area.  In light of the evidence that Mr. Khek made several statements on instant messaging showing that he planned to kill the victim, plus the depth and location of the stab wound, it can be said with certainty that the exclusion of Mr. DeJong's statements that the plan was only to hurt Anthony had no substantial or injurious effect on the jury's verdict for Mr. Khek.  *See Brecht*, 507 U.S. at 638.

The California Court of Appeal's rejection of Mr. Khek's constitutional claims regarding the exclusion of Mr. DeJong's statements that the plan was to only hurt the victim was not contrary to or an unreasonable application of clearly established federal law, as set forth by the U.S. Supreme Court.

---

[4] The victim's first name is used because he shares a surname (Nguyen) with a witness and another participant in the gang activities.

B.    Admission of Mr. DeJong's Hearsay Statement About His Own Activities

Mr. Khek argues that the trial court violated his right to due process in allowing the prosecutor to introduce evidence of Robert DeJong's statement to the police regarding Mr. DeJong's drive to the Q-Cup and Mr. DeJong's conduct before and during the stabbing.

1.    Background

At trial, the parties stipulated to the admission of a portion of a statement Mr. DeJong made to the police during the course of the investigation, subject to Mr. Khek's objections. They preserved for appeal Mr. Khek's objections that the admission of the evidence violated his Sixth Amendment rights and that the stipulated statement did not represent the totality of Mr. DeJong's statement to the police. *See* RT 2397-98, RT 2406-07. The stipulated statement eliminated references to Mr. Khek that were in the original version of Mr. DeJong's statement to police, "such as, 'I went to [Khek's] house. It was me and [Khek],' 'We were driving to Q–Cup,' 'We drove back around and we saw him,' 'then he ran out of the car,' 'and . . . three times he stuck him,' and 'then I took him back home.'" Cal. Ct. App. Opinion at 13 (alterations and omission in original).

The prosecutor read the following stipulation of DeJong's statement to the jury:

"Number one: On September the 6th, 2007, DeJong drove to the Q–Cup retail center. [¶] Two: He parked on a street behind the retail center. [¶] Three: DeJong got out of his vehicle, went inside the Q–Cup, didn't buy anything, and walked back out. [¶] Four: After DeJong left the Q–Cup he walked back to the car, got in, and began to drive away. He turned north on Yuma—it's spelled Y-u-m-a. He then turned onto Southside to Senter Road, went down Senter, saw Anthony Nguyen, did a U-turn, stopped in front of the retail center, and then parked on the corner. After stopping there he drove to the back of the retail center. [¶] Number five: DeJong told the police that he was there approximately five to ten minutes before the stabbing."

RT 2654-55.

On appeal, Mr. Khek contended that the admission of the stipulated statement violated Mr. Khek's Sixth Amendment right to confront Mr. DeJong.[5] The California Court of Appeal

---

[5] Khek also argued on appeal that the admission of the evidence was improper under the California Evidence Code because it was not the complete statement made by DeJong (e.g., it excluded the

concluded that Mr. Khek was "incorrect" in his contention that the admission of the statement violated his rights as explained in *Crawford v. Washington*, 541 U.S. 36 (2004).

> In *Crawford, supra*, 541 U.S. at pages 53 through 54, 68, and *Davis v. Washington* (2006) 547 U.S. 813, the court held that admission of testimonial hearsay statements against a defendant violates the Sixth Amendment confrontation clause when the declarant is not, and has not previously been, subject to cross-examination. Further, because the confrontation clause applies to "'witness[es] "against"'" the accused, that constitutional provision is implicated only to the extent an out-of-court statement is "admitted 'against' defendant." (*People v. Lewis* (2008) 43 Cal.4th 415, 506.)
>
> The issue of whether a statement is offered against a defendant for the purposes of the confrontation clause commonly arises in the situation addressed by the *Aranda–Bruton* line of cases (*People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123, 126–137), in which one defendant's confession or inculpatory statement that is offered in a joint trial as evidence against him by the prosecution also includes evidence that is inculpatory of a codefendant. If such a statement is properly redacted to remove reference to the codefendant and a limiting instruction is given, the statement may be admitted in a joint trial without violating the codefendant's right to confrontation, as it is not considered to be offered against the codefendant within the meaning of the confrontation clause. (*Richardson v. Marsh* (1987) 481 U.S. 200, 211; *Gray v. Maryland* (1998) 523 U.S. 185, 196.)
>
> Thus, when a statement "contain[s] no evidence *against* defendant," it "cannot implicate the confrontation clause." (*People v. Stevens* (2007) 41 Cal.4th 182, 199, italics added.)
>
> Here, DeJong's statement contained no evidence against Khek because it neither identified Khek nor contained any inculpatory information as to him. "Thus, it cannot implicate the confrontation clause. [Citations.] The same redaction that

---

exculpatory statements discussed in the preceding section that the plan was only to injure Anthony). The California Court of Appeal rejected that argument, explaining that California Evidence Code section 356 did not require that, whenever any part of a statement was admitted, the door was opened "for anything said out of court on any subject merely because it was uttered on the same occasion as the statement admitted in evidence." Cal. Ct. App. Opinion, p. 16. The appellate court explained that the stipulated statement did not contain anything so "incomprehensible or misleading" that it "need[ed] clarification from other statements that DeJong made in the same police interview." Cal. Ct. App. Opinion, p. 17. Further, the excluded portion of DeJong's statement (i.e., the portion in which he stated that they intended to injure the victim) was about a different subject matter, i.e., the motive, rather than his participation and did not need to be admitted under state law. *Id.* The state appellate court's ruling on this state law evidence claim is not subject to review in a federal habeas action. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

United States District Court
For the Northern District of California

'prevents *Bruton* error also serves to prevent Crawford error.' " (*People v. Stevens*, supra, 41 Cal.4th at p. 199.)

Cal. Ct. App. Opinion, at 14-15 (alternations in original).

    2.   <u>Analysis</u>

       The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him."  U.S. Const. amend. VI.  The ultimate goal of the Confrontation Clause "is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  It commands, not that evidence be reliable, but that reliability be assessed in a particular manner:  by testing in the crucible of cross-examination." *Crawford*, 541 U.S. at 61.

       The Confrontation Clause applies to all "testimonial" statements.  *See Crawford*, 541 U.S. at 50-51.  "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact."  *Id.* at 51 (internal quotation marks and brackets omitted); *see id.* at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."); *id.* at 68 ("[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations").  In *Davis v. Washington*, 547 U.S. 813 (2006), the Supreme Court distinguished testimonial and non-testimonial statements to police.  "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."  *Id.* at 822; *see, e.g., id.* at 826-28 (victim's frantic statements to a 911 operator naming her assailant who had just hurt her were not testimonial); *id.* at 829-30 (victim's statements to officer telling him what had happened were testimonial, as there was no emergency in progress and were made after police officer had separated victim and assailant); *Crawford*, 541 U.S. at 39-40, 68 (statements were testimonial where made by witness at police station to a series

of questions posed by an officer who had given *Miranda* warnings to witness and was taping and making notes of the answers).

Mr. DeJong's statement to the police during an interview at the police station days after the stabbing plainly was "testimonial" because it was "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Crawford*, 541 U.S. at 52. Mr. DeJong's statement fit squarely within *Crawford*'s definition of testimonial statements. *See Davis*, 547 U.S. at 829-30 (victim's statements to officer telling him what had happened were testimonial, as there was no emergency in progress and were made after police officer had separated victim and assailant); *Crawford*, 541 U.S. at 39-40, 68 (statements made by witness at police station after witness was given Miranda warnings were testimonial). There was no ongoing emergency at the time of the statement.

The California Court of Appeal's Confrontation Clause analysis was an unreasonable application of *Crawford* and *Bruton v. United States,* 391 U.S. 123 (1968). The California Court of Appeal reasoned that Mr. DeJong's statement was not offered against Mr. Khek and therefore did not implicate Mr. Khek's Confrontation Clause rights. The California Court of Appeal reached that conclusion by mistakenly failing to distinguish statements made by a codefendant on trial with a defendant from a statement made by a coperpetrator/codefendant *not* on trial with a defendant. First, the state appellate court relied on a California Supreme Court case for the proposition that the Confrontation Clause is "implicated only to the extent an out-of-court statement is admitted against [a] defendant." Cal. Ct. App. Opinion at 14 (quoting *People v. Lewis*, 43 Cal.4th at 506 (internal quotation marks omitted)). The cited case (*Lewis*), however, noted that a statement is not admitted against a defendant when the jury has been instructed that the statement does not apply to this defendant. Here, Mr. Khek's jury was not instructed that Mr. DeJong's statement was not to be considered against Mr. Khek. The California Court of Appeal incorrectly determined that the statement was not evidence against Mr. Khek subject to the protections of the Confrontation Clause. Given that Mr. DeJong was not on trial, there was no reason to admit his statement other than to be evidence against Messrs. Khek and Lee. Mr. DeJong's statements were relevant to show that Mr. Khek was lying in wait, and the prosecutor so

13

argued.

Second, the California Court of Appeal erroneously relied on the *Bruton* line of cases to determine that the redaction of Mr. DeJong's statement to remove reference to Mr. Khek made the statement admissible. Cal. Ct. App. Opinion, p. 14. This was erroneous because *Bruton* does not apply when the codefendant whose statement is redacted is tried separately. *United States v. Mitchell*, 502 F.3d 931, 965 (9th Cir. 2007) (en banc). The *Bruton* line of cases simply did not apply to Mr. DeJong's statement because Mr. DeJong was not on trial with Mr. Khek. The *Bruton* line of cases concerns admission of a confession from a nontestifying codefendant at a joint trial for use against the nontestifying codefendant, and the jury's ability to follow instructions not to consider the evidence against the other defendant. *See, e.g., Bruton*, 391 U.S. at 124 (admission of codefendant's confession where petitioner and codefendant were on trial together); *id.* at 137 ("Despite the concededly clear instructions to the jury to disregard [codefendant's] inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination").[6]

---

[6] *Bruton* held that a defendant is deprived of his Confrontation Clause rights when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant. The next case in the series, *Richardson v. Marsh*, 481 U.S. 200 (1987), considered the admission of the confession of a nontestifying codefendant at a joint trial in which the "confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony)." *Id.* at 208. *Richardson* held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211. In that same term, *Cruz v. New York*, 481 U.S. 186 (1987), held that, "where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him." *Id.* at 193 (internal citation omitted). More than a decade later, in *Gray v. Maryland*, 523 U.S. 185, 195 (1998), the Supreme Court held that the introduction at a joint trial of a nontestifying codefendant's confession in which redactions "replace a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted are similar enough to *Bruton*'s unredacted confessions as to warrant the same legal results." *Gray* stands for the proposition that a redaction that obviously suggests it is referring to the defendant is just as unacceptable under the Confrontation Clause as the confession in *Bruton* was.

United States District Court
For the Northern District of California

1    Here, Mr. DeJong's case had been severed, and he was not on trial with Messrs. Lee and

2    Khek.  *See* CT 2214.  Since Mr. DeJong was not on trial, there was no reason to admit his

3    statement other than to be evidence against Messrs. Khek and Lee.  The state appellate court's

4    determination that Mr. DeJong's statement was *not* against Mr. Khek was erroneous.  The reliance

5    on *Bruton* was unreasonable for the further reason that, unlike the situation in *Bruton*, there was

6    no limiting instruction that the evidence could not be used against Mr. Khek.  The state appellate

7    court's extension of the *Bruton* line of cases to the admission of a statement from a person who

8    was involved in the crime but was not on trial with Mr. Khek was an objectively unreasonable

9    application of the *Bruton* line of cases.  *See Williams v. Taylor*, 529 U.S. 362, 408 (2000)

10   (O'Connor, J.) (state court decision that "unreasonably extend[s] a legal principle from our

11   precedent to a new context where it should not apply" may be an unreasonable application of

12   clearly established federal law under 28 U.S.C. § 2254(d)(1)).  Because the California Court of

13   Appeal's rejection of the Confrontation Clause claim was an "unreasonable application of clearly

14   established Federal law, as determined by the United States Supreme Court," habeas relief is not

15   barred by 28 U.S.C. § 2254(d)(1).

16   Determining that habeas relief is not barred by § 2254(d)(1) does not end the matter,

17   because the court must still determine whether the error was harmless.  For purposes of federal

18   habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether

19   the admission of the evidence "'had substantial and injurious effect or influence in determining the

20   jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (quoting *Kotteakos v. United States*,

21   328 U.S. 750, 776 (1946)); *see also Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002)

22   (*Brecht* test applies to Confrontation Clause violations).

23   The Confrontation Clause violation did not have a substantial and injurious effect or

24   influence in determining the jury's verdict against Mr. Khek.  Interestingly, it was the fact that the

25   statement had been redacted that helped make its admission harmless.  The version of Mr.

26   DeJong's statement that the jury heard had no references to Mr. Khek.  Instead, the statement was

27   facially neutral to Mr. Khek and described only Mr. DeJong's actions without reference to anyone

28   else who may have been present.  The method of redaction did not even suggest there was

United States District Court
For the Northern District of California

1   someone with Mr. DeJong.  Thus, for example, the jury heard that "DeJong drove to the Q-Cup

2   retail center," rather than that DeJong drove Mr. Khek to the Q-Cup retail center.

3          At trial, there was no real dispute about the identity of the assailant or the cause of the

4   victim's death.  Instead, the key question was whether Mr. Khek intended to kill the victim when

5   he stabbed him.  Mr. Khek's closing argument conceded that there was enough evidence for a

6   second degree murder conviction and urged the jury to focus on whether there was enough

7   evidence to find that the murder was first degree murder.  *See* RT 2985 (Mr. Khek's attorney

8   argues:  "It pains me to say this.  Kosal Khek is guilty of second degree murder.").  Defense

9   counsel argued that the damning instant messages were tough talk between teens trying to fit into

10  the gang, and that there were conflicting inferences that could be drawn from some of the

11  evidence.  In light of the evidence at trial, it was an uphill fight for counsel.  Most notably, the

12  instant messages Mr. Khek exchanged with Mr. Lee and some other acquaintances were very bad

13  for the defense.  Some instant messages indicated a plan to hurt rather than kill in retaliation for

14  the attack on a person affiliated with Mr. Khek's gang, but other instant messages plainly

15  contained Mr. Khek's statement that he was going to kill Anthony.  Most notably, Mr. Khek sent

16  an instant message on the day before the killing, stating, "'That bitch is going to fuckin' die,'" and

17  sent an instant message just hours before the killing asking another gang member, "'do you want

18  to go kill a kid with me?'"  RT 2209, 2233.   The stipulated statement of Mr. DeJong that was

19  admitted did not mention anything about Mr. Khek's intent, and that strongly indicates its

20  admission was harmless.

21          Mr. Khek points out that, even if Mr. DeJong's statement looked facially neutral, the

22  prosecutor argued that the jury should infer that Mr. DeJong was the driver who took Mr. Khek to

23  the site and waited while he attacked the victim.  Although true, this does not show the admission

24  of this evidence was not harmless error.  Mr. Khek did not contend that he was not the person who

25  stabbed Anthony and instead presented a defense that the stabbing was intended to hurt rather than

26  kill Anthony.  Connecting Mr. DeJong's activity to the stabbing committed by Mr. Khek did

27  nothing to show whether Mr. Khek intended to kill or only to injure when he stabbed the victim.

28  Mr. DeJong's statement was as consistent with a stabbing done with the intent to injure as with a

16

1   stabbing done with the intent to kill.

2        The admission of Mr. DeJong's statement also did not have a substantial and injurious

3   effect on the verdict with regard to the prosecutor's alternate theory that Mr. Khek had committed

4   first degree murder by lying in wait.[7]   Mr. DeJong's statement did not provide any information

6   [7] The jury was given the following first degree murder instruction that covered deliberate and premeditated first degree murder, as well as on first degree murder by lying in wait:

8        You may not find a defendant guilty of first degree murder unless all of you agree that the People have proved that the defendant committed murder. But all of you do not need to agree on the same theory.
7

        A defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he  decided to kill before completing the act that caused death.

        The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

        A defendant is guilty of first degree murder if the People have proved that the defendant murdered while lying in wait or immediately thereafter.  A defendant murders by lying in wait if:
1. He concealed his purpose from the person killed;
2. He waited and watched for an opportunity to act;
AND
3. Then, from a position of advantage, he intended to and did make a surprise attack on the person killed.

        The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation or premeditation. Deliberation means carefully weighing the considerations for and

17

United States District Court

For the Northern District of California

1    that Mr. Khek was lying in wait.  The prosecutor may have used Mr. DeJong's statement about

2    driving to the site to support the inference that Mr. Khek was guilty of first degree murder by lying

3    in wait, but other stronger evidence already supported that argument and the prosecutor

4    emphasized that evidence.  Phong Nguyen and his girlfriend, Kim Huynh, were eyewitnesses to

5    the stabbing and both knew Mr. Khek from several months earlier when he came to play Xbox at a

6    friend's house.  RT 1683-85; RT 1717-19.  Mr. Nguyen testified that he had seen Mr. Khek

7    walking around the parking lot about a half hour before the stabbing, RT 1682-83; Mr. Khek

8    walked up to Anthony, asked if he was Anthony and, when Anthony confirmed that he was, Mr.

9    Khek immediately stabbed Anthony, RT 1673-74, 1677; the attack was quick, a surprise, and

10   unprovoked, RT 1674-75; and Mr. Khek ran away after stabbing the victim, RT 1677.  Ms. Huynh

11   provided similar testimony, although she did not testify to seeing Mr. Khek in the parking lot

12   earlier.  Ms. Huynh testified that Mr. Khek approached, asked Anthony if he was Anthony and

13   then stabbed him.  RT 1709-11; Mr. Khek then ran off, RT 1712; and Anthony had done nothing

14   to provoke the attack, RT 1713-14.  Neither witness had seen the weapon.  This eyewitness

15   testimony suggested that Mr. Khek had been waiting and watching for an opportunity to act,

16   concealed his purpose from Anthony, and sprung a surprise attack on the unsuspecting Anthony.

17   Additionally, there were instant messages that suggested that Mr. Khek was planning a surprise

18   attack on Anthony: Mr. Khek obtained a picture of Anthony because he did not know what

19   Anthony looked like, RT 2169-70; Mr. Khek asked about Anthony's school schedule, RT 2172;

20   Mr. Khek observed that Anthony and others affiliated with the rival gang knew what Mr. Khek

21

22   _____

23          against a choice and, knowing the consequences, deciding to act.
              An act is done with premeditation if the decision to commit the act

24            is made before the act is done.

25              A person can conceal his or her purpose even if the person
              killed is aware of the person's physical presence.

26

27              The concealment can be accomplished by ambush or some
              other secret plan.

28   CT 2572-74 (CALCRIM 521).

                                                    18

1   looked like so he had to "get to know" the school "for a bit," RT 2176-77, which suggested a plan

2   for a surprise attack and quick departure; and Mr. Khek sent a message to Mr. Lee on the day of

3   the killing that he was going to get Anthony after school, RT 2216.  Without Mr. DeJong's

4   statement, there was plenty of evidence on which the prosecutor could rely for both theories of

5   first degree murder.

6        The prosecutor relied on the testimony of Phong Nguyen and Kim Huynh to support his

7   argument that the jury could find that Mr. Khek committed first degree murder by lying in wait.

8   *See* RT 2886 (Lying in wait is "a term of art.  It was a surprise. . . .  None of the witnesses actually

9   saw the weapon.  Nothing about how the male who walked up to Anthony gave anyone any clue

10  he was about to be killed.  There weren't any angry words.  There wasn't any kind of aggressive

11  posturing, posing, stuff like that.  He only asked him if he was Anthony.  He said yes.  And he

12  began the attack and fled."); RT 2888 (absence of defensive wounds on Anthony's arms suggested

13  he did not have enough time to protect himself); RT 2887 (Phong's testimony that he "had seen

14  the attacker earlier walking through the parking lot.  This is [an] important fact relevant to lying in

15  wait.").  The prosecutor also argued at length that Mr. Khek was guilty on a deliberate and

16  premeditated murder theory.  See RT 2908-2925.  Mr. DeJong's name was not even mentioned

17  until 50 pages into the closing argument (at RT 2931), when the prosecutor returned to the lying-

18  in-wait theory.  The prosecutor again relied primarily on the testimony of Phong Nguyen and Kim

19  Huynh for the details of the attack, and relied on the testimony of Phong Nguyen who saw Mr.

20  Khek in the parking lot about 20 minutes before the stabbing.  RT 2934, 2936.  The prosecutor

21  further argued that the evidence supported an inference that Mr. DeJong drove Mr. Khek to the

22  location where Phong saw him about 20 minutes before the stabbing, RT 2934-35, and that Mr.

23  DeJong drove Mr. Khek back to the apartment where they met up with Mr. Lee, RT 2936.  The

24  prosecutor also once again returned to arguing that Messrs. Khek and Lee were liable for a

25  deliberate and premeditated first degree murder; Mr. DeJong's transportation of Mr. Khek to the

26  stabbing was mentioned but was not the centerpiece of the argument, RT 2940-46.  The prosecutor

27  relied much more on the instant messages, the eyewitness testimony, and the retaliatory motive.

28  *Id.*  With the abundance of instant messages and the eyewitness testimony available, the DeJong

United States District Court
For the Northern District of California

19

United States District Court
For the Northern District of California

1    statement was not essential to the prosecutor's closing argument.

2        The length of jury deliberation may be examined when assessing harmlessness.  "'Longer

3    jury deliberations weigh against a finding of harmless error because lengthy deliberations suggest

4    a difficult case.'"  *United States v. Lopez*, 500 F.3d 840, 846 (9th Cir. 2007) (quoting *United*

5    *States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001)); *see, e.g., id.* at 846 (jury's

6    deliberation for 2-1/2 hours on illegal reentry case suggested any error in allowing testimony or

7    commentary on defendant's post-arrest silence was harmless); *Velarde-Gomez*, 269 F.3d at 1036

8    (jury deliberation for 4 days supported inference that impermissible evidence affected

9    deliberations).  The deliberations in Mr. Khek's case were remarkably short.  After a 30-day trial,

10   the jury took just four hours (including a one-hour lunch break) to reach a verdict.  CT 2590.  The

11   brevity of deliberations provides a further strong indicator that the admission of Mr. DeJong's

12   statement was harmless.

13       Mr. Khek is not entitled to the writ on his Confrontation Clause claim.  Although there was

14   a Confrontation Clause violation, the error did not have a substantial and injurious effect on the

15   jury's verdict.[8]

16   C.   Juror Misconduct Claim

17       Mr. Khek contends that his rights to trial by an impartial jury and due process were

18   violated due to juror misconduct.  He alleges that, although two jurors were dismissed for two

19   incidents of juror misconduct, other jurors were tainted and that deprived him of an impartial jury.

20   Specifically, he argues that Juror Nos. 4, 6, 8, 9 and 10 had concerns.  See Docket No. 1 at 19;

21   Docket No. 29 at 9-10.

22       In a nutshell, Juror No. 10 reported to the court that (a) she saw codefendant Mr. Lee make

23   a gun-like gesture with his hand toward the jurors, and (b) several jurors observed a child holding

24

25   [8] Mr. Khek also contended in his federal petition that, if his attorney's objection to Mr. DeJong's
     statements based on the "Sixth Amendment" was insufficiently specific to preserve his *Crawford*
26   claim, he received ineffective assistance of counsel.  The problem he anticipated never arose.  The
     California Court of Appeal reached the merits of the *Crawford* claim and did not impose a
27   procedural bar based on any deficiency in counsel's objection.  Therefore, the claim of ineffective
     assistance of counsel is rejected because the contingency on which it rests -- i.e., a state court
28   rejection of the *Crawford* claim because of a failure to adequately object -- did not occur.

a cell phone in a way that made them think he was taking pictures of them.  The court held a

lengthy hearing, at which the evidence showed that (a) only Juror No. 10 had seen the alleged gun-

like gesture, although she had mentioned to several other jurors that she had seen it and tried to

solicit their support in presenting the issue to the judge, and (b) no juror had been photographed

because the child with the phone was the victim's 11-year old brother playing with a cell phone

that had no camera or picture-taking abilities.  The trial judge excused Juror No. 10 and Alternate

Juror No. 3, but denied the defense motion for a mistrial.

     1.    Background

     The California Court of Appeal gave a detailed explanation of the relevant events that

began with a note from the jury on the 26th day of a 30-day trial.[9]

> After the jury had sent a note to the trial court, the trial court held a hearing after excusing from the hearing Juror No. 5, Juror No. 9, Alternate Juror No. 1, and Alternate Juror No. 4, who professed no knowledge of the purpose for the hearing. The trial court's questioning of the remaining jurors revealed the following.
>
> 1. Juror No. 10 stated that, when the jury was in the waiting room during the previous week, a young boy was pointing his cell phone at the jury as if he were taking the jury's picture; Alternate Juror No. 3 stated that he had seen the boy raising his cell phone as if he were snapping pictures and Juror No. 3 stated that it looked as if the boy were taking pictures; no other jurors saw the incident but the jurors had discussed the incident before Juror No. 10 wrote a note to the trial court to express concerns about the incident.
>
> 2. Juror No. 10 stated that, on one occasion when the attorneys had approached the bench, Lee looked at the jury, made a hand gesture at his chin with his hand shaped like a gun, and scratched his chin when the attorneys turned around and returned to the defense table; no other jurors saw the incident but the jurors (except Juror No. 4 and Juror No. 11) had discussed the incident before Juror No. 10 wrote the note to the trial court (the trial court excused Juror No. 4 and Juror No. 11 from the hearing after learning that they did not participate in the jury discussion about the gun incident).
>
> Outside the jury's presence, the parties identified the young boy as Anthony Nguyen's brother and the trial court called him to testify. The boy stated that he possessed a cell phone but it did not have the ability to take photographs. The trial

---

[9] The note stated:  "'Your Honor, we the jury need to talk to you alone without counsel, defendants or audience for a few minutes.  It has nothing to do with the case.  It's about a couple of incidents that happened.  One in the hall outside your courtroom, one inside the courtroom. Jurors 1 to 12 and Alternate Jurors 1 to 4.'"  RT 2410-11.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

court then called the boy's father who testified that the boy's cell phone did not have the ability to take photographs. It then called back the individual jurors separately, questioned them in more detail about the two incidents, allowed defendants' attorneys to question them, and admonished them against talking about the case among themselves before the case was submitted to them. At the conclusion of this process, Khek moved for a mistrial grounded on the hand gesture. He argued that Lee had threatened the jury and he could not therefore "receive a fair trial because of the actions of Mr. Lee in a case where there are gang allegations, where there are incredible amounts of evidence showing them doing things together, for each other, with each other. I don't know how to describe Mr. Lee's threatening of jurors in any other way other than just outrageous conduct." Lee moved to discharge Juror No. 10 and Juror No. 3. . . . .

The trial court declined to declare a mistrial but agreed to excuse Juror No. 10 and Alternate Juror No. 3. It explained as follows.

"The Court, as the record will reflect, spent a great deal of time examining the jurors. Although frankly not required and it's strictly within the Court's discretion, the Court felt the issues were important enough to allow counsel to voir dire the jurors as appropriate because the Court doesn't perceive itself as having any particularized wisdom in fact gathering. Having said that while counsel were examining the jurors, ... the Court had the opportunity to observe the jurors.... [¶] The Court nowhere is making any factual findings. It is evident that Juror Number 10 sincerely—and frankly, [trial court addresses Lee's counsel], I don't think there was the equivalency—the—I don't think she was necessarily backing down. I think Juror Number 10 is adamant about what she believes she saw and she honestly believes she saw Mr. Lee make the gesture that she described. At most she would acknowledge that she couldn't know who was in his mind when she believes he made it. She has told us what her interpretation was. [¶] It is clear that none of the other 15 jurors saw the gesture or any type of gesture from Mr. Lee or Mr. Khek that would approximate the description of Juror Number 10. None, and all clearly conceded, none are in a position to evaluate whether it happened or it didn't happen. [¶] You challenged Juror Number 10, if any, challenged Juror Number 10's credibility for her honest belief in what she says she saw. But all of the rest were very frank that they didn't see anything. Notwithstanding that, Juror Number 10 did discuss her observations with most if not all of the balance of the jurors. There were several that were not involved in the discussion. And it was a combination of her telling them what she saw combined with showing them the note she wrote to give us on Monday and seeking their support as it were of the presentation of the note. For her reasons and—speculation may be the wrong word—there are inferences to be drawn as to why she would do that. I think she has concerns. I think she wanted support from the balance of the jury, and notwithstanding the admonitions she shared all that information and sought to perhaps bolster the note she referenced to the jurors she showed it to some of them the issues regarding the young man and the alleged perceptions or the perceptions of the cell phone and/or photos. Her observations of the young man involved her assumptions that it was a camera, and frankly most of the other jurors related their assumptions. This started apparently with one or more jurors standing in the hallway seeing the young man who apparently was making his presence aware to those around him because he's

22

an eleven year old and causing one of the jurors to question, as Juror Number 3 told us, I wonder if he can take pictures. And that then evolved into certainly Juror Number 10 being concerned that their security was at risk if the young man was taking pictures of one or more of the jurors. To the extent there are facts, those are the facts. [¶] The only additional facts have to do with the discussion between Alternate Juror Number 3, Alternate Juror Number 1, and Juror Number 9 Monday after the noon recess prior to the beginning of the afternoon when we were in fact joined by alternate Juror Number 3. And the issue of the comments made by Alternate Juror Number 3 to Juror Number 9 not heard by [A]lternate Juror Number 1.... [¶] ... [¶] Alternate Juror Number 3 has—the questions the Court and counsel presented to him, his answers were all straight forward. He presented a demeanor that suggested no problem with moving forward. Some concerns about the issues regarding the camera. The flavor of the conversation with Juror Number 9, however, gives the Court pause for concern. That—not that he is failing to be candid, because I'm not sure whether he failed to deliver on specific questions asked, but he clearly understood the subjects of discussion. He immediately preceding [sic ] that he had had a discussion with Jurors 9 and Alternate [No.] 1 that expressed his concerns, his feelings vis-à-vis retaliation, how those issues could be dealt with, protection, and conveyed a state of mind that the Court feels compromises his ability to be a fair and impartial juror. And the Court is going to exclude—is excusing, discharging Alternate Juror Number 3 as well as Juror Number 10.[¶] As to the balance of the jurors I'm not going to walk through them individually. They've been outlined. Their words will stand for themselves. I will say as to the remain[ing] jurors there was nothing in their demeanor, their responses, that suggested other than an honest understanding of the law, an honest understanding of their responsibility, the unfortunate as suspects of receiving the information they received, clear recognition that none of those are facts in the case proven as facts in the case, and will not be considered by them in any way, shape, or form; and the Court finds no concern or basis ultimately to cause excusal of any of the rest of the jurors beyond the two that have been outlined."

After excusing Juror No. 10 and Alternate Juror No. 3, the trial court admonished the jury against speculating about the jurors' absence and reminded the jury to bring concerns or issues about the case to it rather than discussing the point among themselves. It then replaced Juror No. 10 with Alternate Juror No. 4.

Cal. Ct. App. Opinion, at 18-22.

   The California Court of Appeal rejected Mr. Khek's claim that the denial of his mistrial motion violated his state and federal rights to trial by an impartial jury.  The court explained that "none of the deciding members of the jury saw Lee's gesture.  The communicative content of the gesture was not about guilt or innocence.  And the jurors' discussions about the gesture were about the gesture, not the facts of the case.  The presumption of prejudice simply did not arise in this case."  Cal. Ct. App. Opinion, at 24.  And, even if the presumption did arise, it was "rebutted by

1   evidence that no prejudice actually occurred." *Id.*

2

3       Here, the trial court implicitly concluded that the jury's impartiality had not been
        adversely affected. It articulated that the demeanor and responses of the remaining
4       jurors convinced it that those jurors had an honest understanding of the law and
        their responsibility such that they would not consider the hand gesture in any way,
5       shape, or form. We accept this determination. (*People v. Nesler, supra,* 16 Cal.4th
        at p. 582 & fn. 5 ["We accept the trial court's credibility determinations and
6       findings on questions of historical fact if supported by substantial evidence."].)
        And, again, the gesture was not about guilt or innocence; it did not cause the jury to
7       converse about guilt or innocence; and it was not inherently prejudicial because
        none of the remaining jurors saw the gesture. Moreover, the trial court admonished
8       the jury against speculating about the reasons why Juror No. 10 and Alternate Juror
        No. 3 had been excused. There is no reasonable probability of prejudice.
9

10

11  Cal. Ct. App. Opinion, at 24-25 (alteration in original).

12      The California Court of Appeal also determined that the cell phone incident did not

13  warrant relief.  That incident was "more accurately characterized as spectator misconduct," and

14  did not warrant relief because prejudice is not presumed and none was shown. *Id.* at 25.

15

16      The cell phone incident was not of such a character as to prejudice defendants or
        influence the verdict for the same reasons we have given about the hand gesture
17      incident. The jurors who saw the boy did not know whether he was, in fact,
        photographing them; being photographed did not pertain to defendants' guilt or
18      innocence; being photographed did not cause the jurors to converse about guilt or
        innocence; being photographed is not inherently prejudicial; and the trial court
19      admonished the jurors and became satisfied that the incident had not adversely
        affected the jurors' impartiality.
20

21  *Id.* at 26.

22          2.      Analysis of Juror Misconduct Claim

23              a.      State Court Did Not Unreasonably Apply Supreme Court Precedent

24      The Sixth Amendment guarantees the criminally accused the right to a fair trial by a panel

25  of impartial jurors.  U.S. Const. amend. VI; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  The

26  jury's verdict "'must be based upon the evidence developed at the trial.'"  *Turner v. Louisiana*,

27  379 U.S. 466, 472 (1965).  "In the constitutional sense, trial by jury in a criminal case necessarily

28  implies at the very least that the 'evidence developed' against a defendant shall come from the

24

United States District Court
For the Northern District of California

1  witness stand in a public courtroom where there is full judicial protection of the defendant's right

2  of confrontation, of cross-examination, and of counsel." *Id.* at 472-73.  Juror exposure to

3  extraneous influences is considered juror misconduct, even when the exposure is not the juror's

4  fault.

5       The "clearly established Federal law, as determined by the Supreme Court of the United

6  States," 28 U.S.C. § 2254(d), regarding juror misconduct based on extrinsic influences comes

7  from three Supreme Court cases:  *Mattox v. United States*, 146 U.S. 140 (1892), *Remmer v. United*

8  *States*, 347 U.S. 227 (1954), and *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  In *Mattox*, the

9  Supreme Court articulated the rule: "Private communications, possibly prejudicial, between jurors

10  and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate

11  the verdict, at least unless their harmlessness is made to appear."  *Mattox*, 146 U.S. at 150.

12  *Remmer* later restated the rule and elaborated on the presumption of prejudice:

13

14         In a criminal case, any private communication, contact, or tampering directly or indirectly,
          with a juror during a trial about the matter pending before the jury is, for obvious reasons,

15         deemed presumptively prejudicial, if not made in pursuance of known rules of the court
          and the instructions and directions of the court made during the trial, with full knowledge

16         of the parties. The presumption is not conclusive, but the burden rests heavily upon the
          Government to establish, after notice to and hearing of the defendant, that such contact

17         with the juror was harmless to the defendant.

18  *Remmer*, 347 U.S. at 229.

19       The *Smith* case focused on the procedural steps the trial court must take when potential

20  juror misconduct arises.  The Constitution "does not require a new trial every time a juror has been

21  placed in a potentially compromising situation."  *Smith*, 455 U.S. at 217.  "Due process means a

22  jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever

23  watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when

24  they happen."  *Id.*   The trial judge can "'determine the circumstances, the impact thereof upon the

25  juror, and whether or not [they were] prejudicial, in a *hearing* with all interested parties permitted

26  to participate.'"  *Id.* at 216 (quoting *Remmer*, 347 U.S. at 230) (alterations in original).  The trial

27  judge may ascertain the impartiality of the juror "by relying solely upon the testimony of the juror

28  in question."  *Id.* at 215; *see also id.* at 217 n.7 (rejecting the argument that the evidence from the

United States District Court
For the Northern District of California

1    juror in question "is inherently suspect").

2         The California Court of Appeal's rejection of Mr. Khek's juror misconduct claim was not

3    contrary to or an unreasonable application of any holding from the U.S. Supreme Court.  Mr.

4    Khek identifies no Supreme Court precedent for his contention that a presumption of prejudice

5    arises with regard to jurors who did not observe the alleged communicative gesture.  *Remmer* does

6    not state that a presumption of prejudice arises for the entire jury whenever one juror is exposed to

7    a private communication, contact or tampering.  Such a finding would require an extension of

8    *Remmer*; under AEDPA, a state court's failure to extend a Supreme Court precedent is not an

9    unreasonable application for purposes of § 2254(d)(1).  *See White v. Woodall*, 134 S. Ct. 1697,

10   1706 (2014).

11        Although a presumption of prejudice may have arisen for Juror No. 10 because she

12   believed that she saw codefendant Mr. Lee make a gun gesture, that does not help Mr. Khek

13   because Juror No. 10 was dismissed from the jury.[10]  The state appellate court reasonably

14

_____

15   [10] Juror No. 10's observation of a gun gesture by Mr. Lee would have been extrinsic evidence
     because it did not "come from the witness stand." *Turner*, 379 U.S. at 473.  *See United States v.*
16   *Simtob*, 485 F.3d 1058, 1064-65 (9th Cir. 2007) (defendant's alleged act of "eye-balling" a juror
     that made the juror feel "threatened" raised a presumption of prejudice "because 'even indirect
17   coercive contacts that could affect the peace of mind of the jurors give rise to the *Remmer*
     presumption'"); *United States v. Schuler*, 813 F.2d 978, 981 (9th Cir. 1987) (prosecutor's
18   comment on nontestifying defendant's courtroom laughter during presentation of evidence of his
     threatening comments impinged on defendant's Fifth Amendment right not to be convicted except
19   on the basis of evidence adduced at trial).  Therefore, the presumption of prejudice arose with
     regard to Juror No. 10 under *Remmer*, 347 U.S. at 228, because that presumption arises when the
20   juror is exposed to an extrinsic influence.
21
     The Court notes that some courts have rejected the idea that a defendant's in-court
22   behavior actually can amount to an extrinsic influence on a juror. S*ee Schuler*, 813 F.2d at 983
     (Hall, J., dissenting) ("The principle that a defendant's courtroom demeanor is evidence is well-
23   settled"); *Wilson v. United States*, 505 F. App'x 884, 886 (11th Cir. 2013) ("We have yet to
     consider in a published opinion whether a defendant's alleged staring at the jury constituted an
24   'extraneous' or 'extrinsic' contact such that the district court was required to conduct further
     inquiry [under *Remmer*, 347 U.S. 227], and we note that our sister circuits are split on the issue");
25   *Waller v. United States*, 179 F. 810, 812 (8th Cir. 1910) ("The demeanor of the defendant is not
     only proper evidence, but it is impossible to prevent the jury from observing and being influenced
26   by it.").  *See generally* 2 J. Wigmore, *Evidence* § 274 (J. Chadbourn rev. ed. 1979) ("the attempt to
27   force a jury to become mentally blind to the behavior of the accused sitting before them involves
     both an impossibility in practice and a fiction in theory").
28

1    determined that the presumption of prejudice did not arise as to any juror who did decide Mr.

2    Khek's guilt.

3         Even if Juror No. 10's discussion of ~~his~~ her observation with other jurors were sufficient to

4    give rise to a presumption of prejudice, the California Court of Appeal also determined that any

5    such presumption was rebutted by evidence that no prejudice actually occurred.  This also was not

6    contrary to or an unreasonable application of Supreme Court precedent.

7         The hearing held in Mr. Khek's case adhered to the procedure suggested in *Smith v.*

8    *Phillips*, determining what happened, and the impact thereof upon the jurors, and the prejudicial

9    effect (if any) of the circumstances "in a hearing with all interested parties permitted to

10   participate."  *Smith*, 455 U.S. at 217.  In Mr. Khek's case, the trial court held a hearing that took

11   about a day and a half, during which the jurors (including alternates) were questioned individually

12   by the judge, prosecutor and defense counsel.  *See* RT 2410-2629; CT 2521-25 (7/26/10 minutes),

13   2526-27 (7/27/10 minutes), CT 2541 (7/28/10 minutes).  The judge announced his decision at the

14   end of the hearing, and explained his reasoning the next day.  RT 2628, 2636-43.

15        Mr. Khek disagrees with the state court's conclusion that the jurors who remained were not

16   affected by the alleged gun gesture and the alleged picture-taking.  Specifically, he urges that Juror

17   Nos. 4, 6, 8, and 9 were not the impartial jurors to which he was entitled.  See Docket No. 1 at 19;

18   Docket No. 29 at 9-10.  According to Mr. Khek, Juror Nos. 4 and 6 "acknowledged being

19   'uncomfortable' about the possibility that [the child] might have taken pictures of jurors with his

20   cell phone," Docket No. 1 at 19; Juror No. 8 "began scrutinizing codefendant Lee's courtroom

21   behavior more carefully," *id.*; and Juror No. 9 "acknowledged being a 'little concerned,'" *id.*  A

22   review of these jurors' responses shows Mr. Khek's argument to be unpersuasive.

23        <u>Juror No. 4</u>:  Juror No. 4 did not learn about the incidents until Juror No. 10 showed her

24   the note before sending it to the court.  RT 2580.  She had not seen the child taking pictures, and

25   did not hear about the gesture until Juror No. 10 mentioned it in court.  RT 2580, 2582.  When

26   asked by the court how the information she now had been made aware of would affect her as a

27   juror, she responded:  "I don't have a problem with it.  I mean at first I felt a little 'should I be

28   threatened?' when I found out -- if he was taking pictures.  I don't know if he was.  That made me

a little uncomfortable but it's not going to change anything." RT 2582.  Juror No. 4 agreed that

she understood that information that came to her from third parties was not evidence.  RT 2583.

She then confirmed that her ability to do her juror functions was not impaired:

> The Court:  Are your abilities to follow the law, the presumption of innocence, the burden of proof beyond a reasonable doubt, evaluating credibility of witnesses, are any of those challenged you believe because of these I'll say allegations?
>
> Trial Juror No. 4:  No.
>
> The Court:  Is your ability to interact with the rest of the jurors challenged?
>
> Trial Juror No. 4:  No.
>
> The Court:      Is anyone standing here inhibited by what occurred?
>
> Trial Juror No. 4:  No.

RT 2583.

Juror No. 4 may have had a brief moment of concern when she wondered if she should feel threatened, but her responses overall showed that she was unaffected by the incidents and remained able to function as an impartial juror.  Her transient moment of concern did not show her to be unable to be an impartial juror.

Juror No. 6:  Juror No. 6 did not see the gun gesture and did not learn of it until Juror No. 10 told her several days earlier.  RT 2565, 2568.  Juror No. 6 thought there could be "several explanations" for the gesture Juror No. 10 showed her.  RT 2566-67.  Juror No. 6. also did not see the child with the camera, but had heard about it from other jurors.  RT 2568.  She and other jurors discussed that it was "an uncomfortable situation" having to wait in the hallway "with the witnesses and the families, and sometimes we felt they were too close and we didn't really know how to handle that.  But I didn't take that as threatening, just uncomfortable because it's [a] sensitive issue."  RT 2568.   The court then asked how the events impacted her service as a juror, and she responded:  "I think it's unfortunate it's kind of spread this far.  But it's -- I don't feel threatened because I didn't see it.  I don't know if that's naïve of me.  And I understand it's a sensitive situation."  RT 2571.  Juror No. 6 agreed there was no evidence on the gesture; she could

compartmentalize and put aside whatever Juror No. 10's observation was and do her juror duties. RT 2573-74.  Juror No. 6 agreed that neither of the defendants lost their presumption of innocence, nor the benefit of requiring proof beyond a reasonable doubt as a result of these incidents, and that she would decide the case solely on the evidence she heard in court.  RT 2574-75.

        Mr. Khek erroneously states that this juror felt uncomfortable about the possibility of the boy taking pictures.  Instead, what the juror said was that she felt that the social situation of being a juror in a hallway with families and witnesses in a murder case was an uncomfortable setting. Juror No. 6's awareness of a socially awkward situation does not reasonably call into question her impartiality.

        <u>Juror No. 8</u>:   This juror first learned about the note from Juror No. 10 that morning before it was presented to the court.  RT 2549.   She did not know about the gesture or the picture taking before then.  RT 2550.  The comments by Juror No. 10 made her notice Mr. Lee a little more.

> The Court:  Do you have any basis to evaluate not the sincerity of [Juror No. 10's] belief but the truth or falseness of what it is she believes or said she saw?
>
> Trial Juror No. 8:  As far as the hand motion the only thing, since she said -- she had mentioned it this morning, I did look at him today in court and I think that he just -- I mean I saw him doing a lot of different things, you know, scribbling or, you know.  I didn't notice any motion that I felt threatened by, but he seems to be someone that uses his hands, right.
>
> The Court:  All right.  So do I take that you were either looking for something that would either give you confirmation of its truthfulness or an explanation as to how it could be misunderstood or just something to help you one way or the other?
>
> Trial Juror No. 8:  Yeah.
>
> The Court:  And what guidance, if any, did you draw from that?
>
> Trial Juror No. 8:  For me I kind of took it as it's just something that he's -- you know, some people talk a lot with their hands or when they're sitting they do little thing.  That's how I took it.
>
> The Court:  So you don't draw the adverse inference that she seems to have drawn from what she related to you?
>
> Trial Juror No. 8:  Correct.

29

**United States District Court**
For the Northern District of California

RT 2550-51.  The juror was further questioned on this point by Mr. Khek's attorney (Mr. Johnson) and by Mr. Lee's attorney (Mr. Pointer):

> Mr. Johnson:  After [Juror No. 10] mentioned this to you this morning, it directed your attention to Mr. Lee; is that right?
>
> Trial Juror No. 8:  At one of the points, yes, I looked over at Mr. Lee.
>
> Mr. Johnson:  So after this morning is it fair to say that you were watching his demeanor in court maybe more carefully than you had prior to this morning?
>
> Trial Juror No. 8:  Probably a little bit more I looked over, yeah.
>
> Mr. Johnson:  Thank you.
>
> *   *   *
>
> Mr. Pointer:  Juror Number 8, did you draw any conclusions at all when you noticed Mr. Lee when you looked over at his demeanor this morning?
>
> Trial Juror No. 8:  Did I notice anything?
>
> Mr. Pointer:  Was there anything that you felt was different than the way he appeared up until this question had arisen?
>
> Trial Juror No. 8:  Nothing different.  I mean I did notice that, you know, he did this type of thing (indicating) or he would scribble on a note pad; but I believe I've seen him scribbling on a note pad other days as well.
>
> Mr. Pointer:  Being fidgety?
>
> Trial Juror No. 8:  Yeah.

RT 2554-55.

Juror No. 8 agreed that she could do her juror duties, would decide the case solely on the evidence heard in court, and would compartmentalize and set aside the information she heard from Juror No. 10.  RT 2552.  She confirmed that what had occurred did not affect her "evaluation of the presumption of innocence afforded to Mr. Lee and Mr. Khek and [her] responsibilities on the proof beyond a reasonable doubt."  RT 2552.

Mr. Khek claims that lack of impartiality is shown by the fact that Juror No. 8 took greater notice of Mr. Lee.  Merely taking greater notice of a defendant did not show that she was not an impartial juror, particularly since she observed nothing troubling to her.  After looking at Mr. Lee,

**United States District Court**
For the Northern District of California

1    Juror No. 8 came to the conclusion that he was merely a fidgety person and one who used his

2    hands a lot.  These observations did not impede her abilities to do her juror duties.

3         Juror No. 9:  Juror No. 9 first became aware of the note that morning when Juror No. 10

4    was showing it to other jurors.  RT 2519-20.   Then after lunch, Alternate Juror No. 3 relayed to

5    him the substance of Juror No. 10's concerns.  Juror No. 9 did not "really know what to think of it.

6    I don't think -- it doesn't really mean anything to me."  RT 2523.  He saw the boy holding up his

7    cell phone, pretending like he was talking on it -- "I didn't know what he was doing but I thought

8    it was a little weird."  RT 2524.  It did not occur to Juror No. 9 that the boy was taking pictures

9    until he heard this morning that it was a possibility.  RT 2524.

10

11              The Court:  When you heard [about Juror No. 10's observations] as
              you think about it now does that give you pause for concern?

12              Trial Juror No. 9:  It concerned me a little.  Not really in the case,
              like it's not really going to [a]ffect my decision as a juror.  But it's

13              just a little myself I was concerned.  But I don't know if it's true and
              whatnot.  It just made me think of it.

14
              The Court:  And as you're sitting here now what does it make you
15            think?

16              Trial Juror No. 9:  I'm not really sure.  I don't know.  I'm okay with
              it I guess.  I really don't know what happened, so.

17

18    RT 2525-26.  Juror No. 9 clearly conveyed that his lack of opinion about the incidents stemmed

19    from him not knowing what actually happened.  *See* RT 2525-26.  Juror No. 9 agreed that what

20    had happened would not compromise his ability to follow the law or spill over against Mr. Khek.

21    RT 2526.

22         Juror No. 9 also stated that, when Alternate Juror No. 3 told him and another juror what

23    was going on after lunch that day, Alternate Juror No. 3 said, "well, if anything happens my

24    friends or my cousin is a probation officer -- I don't know, something.  His brother is a

25    policeman."  RT 2528.  When Juror No. 9 heard that, "'[i]t just kind of seemed out of the ordinary

26    to me.  Like I didn't think anything of it until it was mentioned.  And I had a moment of concern

27    like, well, what does this mean for the rest of the case but that was it."  RT 2528.  He also stated

28    he was "a little surprised" by what Alternate Juror No. 3 said; "I didn't see anything like that, so I

1   didn't really know what to think."  RT 2529.  Juror No. 9 agreed that what he had heard in the

2   hallway and outside of court was not evidence and he could keep it separate from his juror

3   duties.  RT 2529.

4          Juror No. 9 thus was shown to have feelings of concern when he heard the incidents

5   mentioned during that day, including when Alternate No. 3 suggested he had friends in law

6   enforcement to turn to for protection.  But Juror No. 9 also confirmed that none of the information

7   compromised his ability to decide the case based solely on the evidence.  He further agreed that he

8   understood that the information he heard was not evidence and could keep it separate from his

9   juror duties. Mr. Khek has not shown that Juror No. 9 was not an impartial juror.

10          The trial judge, who was in a good position to observe the demeanor of the jurors as they

11   responded to questioning, made factual findings that the jurors' responses and demeanors showed

12   an honest understanding of the law, an honest understanding of their responsibility as jurors, and a

13   willingness to set aside the information that had been received.  RT 2637-41, 2643.  The trial court

14   found "no concern or basis ultimately to cause excusal of any of the rest of the jurors" other than

15   Juror No. 10 and Alternate Juror No. 3.  RT 2643.  Mr. Khek has not overcome the presumption of

16   correctness that attaches to those factual findings.  *See Hedlund v. Ryan*, 750 F.3d 793, 807 (9th

17   Cir. 2014) (in a § 2254 proceeding, the state trial judge's findings regarding juror bias or

18   misconduct are "'presumptively correct' and cannot be overcome without clear and convincing

19   evidence").  Although there was some concern expressed, none of the jurors expressed any

20   reluctance to continue to serve as a juror or inability to properly discharge his or her juror duties.

21   As the Ninth Circuit recently observed, there is no "*per se* rule in which exposure to any out-of-

22   trial information automatically requires juror dismissal.  Such an approach is plainly inconsistent

23   with *Mattox* and its progeny."  *Zapien v. Martel*, 805 F.3d 862, 873 (9th Cir. 2015) (denying

24   habeas relief where state court rejected juror misconduct claim after trial court held a hearing at

25   which judge questioned juror who admitted to hearing a news report that suggested the defendant

26   would hurt his guards if he were given the death penalty, and ruled the juror was capable of being

27   impartial).  As in *Zapien*, the state appellate court's determination that "the trial court properly

28   determined the juror[s] could be impartial" was "in substance" an application of the

**United States District Court**
For the Northern District of California

*Mattox/Remmer* presumption which requires the federal habeas court to be "doubly deferential." *Zapien*, 805 F.3d at 873.  Also as in *Zapien*, the state appellate court's "decision was at least reasonable," and therefore does not support federal habeas relief.

                    b.   <u>Any Error Was Harmless</u>

      Even if there was a constitutional error in not declaring a mistrial due to juror misconduct, federal habeas would not be available if it was harmless.  The receipt of extrinsic evidence or extraneous information by jurors is "generally subject to a 'harmless error' analysis, namely, whether the error had [a] 'substantial and injurious' effect or influence in determining the jury's verdict." *Estrada v. Scribner*, 512 F.3d 1227, 1235 (9th Cir. 2008); *see Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).  Although the *Remmer* presumption and the *Brecht* test do not fit together comfortably, both must be applied.  *See generally Barnes v. Joyner*, 751 F.3d 229, 252-53 (4th Cir. 2014) (remanding to district court for application of *Brecht* test, after concluding that the state court's adjudication of the juror misconduct claim was an unreasonable application of *Remmer*).[11]  The *Remmer* presumption applies to determine whether there was juror misconduct

---

[11] The Ninth Circuit's cases on juror misconduct have taken several different approaches, with none of those cases actually holding that both the *Remmer* presumption and *Brecht* test should be applied or that one test should be used to the exclusion of the other.  *Compare Smith v. Swarthout*, 742 F.3d 885, 894 (9th Cir. 2014) (not mentioning *Remmer*, *Mattox* or any presumption of prejudice;  "[o]n collateral review, trial errors—such as extraneous information that was considered by the jury—are generally subject to a 'harmless error' analysis, namely, whether the error had 'substantial and injurious' effect or influence in determining the jury's verdict"), *and Estrada*, 512 F.3d at 1235, 1238 (applying *Brecht* test to evaluate the consideration of extraneous information by the jury), *with Caliendo v. Warden of California Men's Colony*, 365 F.3d 691, 697, 699 (2004) (reversing with directions to grant relief after concluding only that state court's failure to presume prejudice under the *Remmer/Mattox* rule was contrary to clearly established federal law), *and Xiong v. Felker*, 681 F.3d 1067, 1076 (9th Cir. 2012) (identifying the *Remmer* presumption as part of the juror misconduct rule and finding no error), *with Fields v. Brown*, 503 F.3d 755, 779-81 (9th Cir. 2007) (*en banc*) (pre-AEDPA case, mentioning the *Remmer/Mattox* rule and declining to decide whether the event (a juror's use of a Bible to make a list of pros and cons, with Biblical passages as support) was juror misconduct because it was harmless under the *Brecht* standard).  By applying both the *Remmer* presumption and the *Brecht* test, this Court follows both the spirit of § 2254(d)(1), which requires the Court to look to Supreme Court precedent to identify the "clearly established law" by which to evaluate a habeas claim, and the purpose of *Brecht*, which limits habeas relief only to those constitutional errors that have an actual and injurious effect on the jury's verdict.

United States District Court
For the Northern District of California

(including whether the juror was prejudiced) amounting to a constitutional violation; *Brecht* applies to determine whether the constitutional violation was harmless to the petitioner.  When the court applies the *Brecht* test, the petitioner is "not . . . entitled to the *Remmer* presumption in attempting to make this [*Brecht*] showing because the presumption does not apply in the federal habeas context when proving a substantial and injurious effect or influence *on the jury's verdict*. Therefore, to be entitled to habeas relief, [the petitioner] will need to affirmatively prove actual prejudice by demonstrating that the jury's verdict was tainted by the extraneous communication." *Barnes*, 751 F.3d at 252-53 (emphasis added) (citation omitted).

Habeas relief is not available on the juror misconduct claim in this case because Mr. Khek has not shown that the constitutional error had a substantial and injurious effect or influence on the jury's verdict.

First, there was substantial evidence of Mr. Khek's guilt.  As mentioned in the harmless error analysis in the Confrontation Clause section, i.e., section B.2 above, there were the extremely damaging instant messages in which he announced his intent to kill Anthony and there was eyewitness testimony that he did in fact kill Anthony in a surprise attack.

Second, the incidents were brief and became known to most jurors at least several days before jury deliberations began -- i.e., Juror No. 10 sent the note to the court on the 26th day of trial, and the deliberations did not begin until the 30th day of trial.  The other jurors had learned of the alleged gun gesture and picture-taking that day, or during the preceding week.  The juror misconduct that occurred days before deliberations began, and as to which the court was able to provide admonishments to the jurors, was less likely to have any impact on the jury's verdict.  *See generally Henry*, 720 F.3d at 1086 ("The Supreme Court, for instance, has found juror misconduct to warrant reversal in cases involving *extended* external influences on jurors or confirmed juror *bias* – neither of which is present here").

Third, the jury deliberated only about four hours before returning a verdict in this 30-day trial, suggesting this was not a close case.  *See United States v. Lopez*, 500 F.3d at 846 ("'Longer jury deliberations weigh against a finding of harmless error because lengthy deliberations suggest a difficult case.'").

1    Mr. Khek has not shown that any error in not declaring a mistrial due to juror misconduct

2    had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507

3    U.S. at 637.  Mr. Khek therefore is not entitled to federal habeas relief on his juror misconduct

4    claim.

5                    c.    No Juror Bias

6    The presence of an actually biased juror would violate the Sixth Amendment's right to an

7    impartial jury and would support habeas relief.  Actual bias in a juror has been defined as "'the

8    existence of a state of mind that leads to an inference that the person will not act with entire

9    impartiality.'  Actual bias is typically found when a prospective juror states that he can not be

10   impartial, or expresses a view adverse to one party's position and responds equivocally as to

11   whether he could be fair and impartial despite that view." *Fields v. Brown*, 503 F.3d 755, 767 (9th

12   Cir. 2007) (en banc) (citations omitted) (rejecting claim of actual bias in juror who said he put

13   aside the fact that his wife was the victim of a similar assault and represented that he was

14   impartial).  "It is sufficient if the juror[s] can lay aside [their] impression[s] or opinion[s] and

15   render a verdict based on the evidence presented in court."  *Irvin v. Dodd*, 366 U.S. 717, 723

16   (1961) (defendant was denied a trial by an impartial jury as a result of extensive adverse pretrial

17   publicity).  Implied bias (e.g., bias that may be presumed from a juror who repeatedly lies during

18   voir dire or a juror who is closely related to a litigant) would not support habeas relief because the

19   "Supreme Court has never explicitly adopted or rejected the doctrine of implied bias."

20   *See Hedlund*, 750 F.3d at 808.  Unlike juror misconduct, the presence of an actually biased juror is

21   structural error, requiring a new trial without a need to show prejudice under *Brecht*.  *See Smith v.*

22   *Swarthout*, 742 F.3d 885, 892 n.2 (9th Cir. 2014).

23   For the same reasons discussed in the juror misconduct section above, the Court concludes

24   that Mr. Khek has not shown juror bias in any of the jurors who remained on the jury that

25   deliberated.  Juror Nos. 4, 6, 8 and 9 expressed some limited concerns, but Mr. Khek falls far short

26   of showing that any of them had a state of mind that leads to an inference that any of them would

27   not act with impartiality in considering this case.  In addition to their words, these jurors'

28   inflection, tone and demeanor are the sort of factors that go into the trial judge's determination of

**United States District Court**
For the Northern District of California

35

their impartiality and ability to serve as jurors.  The presumption of correctness under 28 U.S.C. §

2254(e)(1) in the trial court's determination that the remaining jurors were not actually biased has

not been overcome by Mr. Khek.  *See Hedlund*, 750 F.3d at 807 (in a § 2254 proceeding, the state

trial judge's findings regarding juror bias or misconduct are "'presumptively correct' and cannot

be overcome without clear and convincing evidence"); *cf. Skilling v. United States*, 561 U.S. 358,

395-96 (2010) (in reviewing claims that the trial court failed to dismiss a juror for actual bias

during voir dire, "the deference due to district courts is at its pinnacle.")  It was not an

unreasonable application of Supreme Court precedent for the California Court of Appeal to

conclude that Mr. Khek had not shown actual bias by any of the jurors who remained on the jury

that decided his case.

Mr. Khek cannot obtain relief on his claim that he was denied a trial by an impartial jury

because he has not met his burden to show that the California Court of Appeal's rejection of his

jury misconduct claim "was so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*

*v. Richter*, 562 U.S. 86, 103 (2011) (discussing the very restrictive nature of § 2254(d)).

D.     Admission of Photo Of Victim

1.     Background

Mr. Khek contends that the admission of a photo of the dead victim's body at the crime

scene violated his right to due process.  The photo was objectionable, in Mr. Khek's view, because

it depicted the abdominal wound with several inches of intestines protruding from the victim's

abdomen where he had been stabbed.

The admissibility of several photos was considered outside the presence of the jury.  The

prosecution wanted to introduce several photos from the crime scene and the autopsy.  Defense

counsel objected to several photographs as being unduly prejudicial in that they were "gruesome."

RT 602.  After hearing arguments and studying the packet of photos, the court determined the

photos were relevant.  The trial court acknowledged that the photos were "gruesome," but also

recognized that they accurately represented the crime scene and were relevant to several issues,

including intent, malice, premeditation and deliberation.  RT 619-20.   The trial court applied

1   California Evidence Code § 352, choosing to admit just one photo from the crime scene to show

2   the result of the abdominal wound while excluding other photos as cumulative or unduly

3   prejudicial relative to their probative value.[12]

4        The California Court of Appeal rejected the challenge to the admission of the photo of the

5   victim with his intestines protruding from the abdominal knife wound. The appellate court only

6   discussed the admission of the evidence under California Evidence Code section 352 and did not

7   discuss the claim that the admission of the evidence violated Mr. Khek's federal right to due

8   process. Because the federal constitutional claim was rejected by the state appellate court without

9   explanation, this Court "must determine what arguments or theories supported or . . . could have

10  supported, the state court's decision; and then it must ask whether it is possible fairminded jurists

11  could disagree that those arguments or theories are inconsistent with the holding in a prior

12  decision of [the U.S. Supreme] Court." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

13       2.    <u>Analysis</u>

14       The United States Supreme Court has never held that the introduction of propensity or

15  other allegedly prejudicial evidence violates due process. *See Estelle v. McGuire*, 502 U.S. 62,

16  68-70 (1991); *id.* at 75 n.5 ("we express no opinion on whether a state law would violate the Due

17  Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a

18  charged crime").

19       In *Estelle v. McGuire*, the defendant was on trial for murder of his infant daughter after she

20  was brought to a hospital and died from numerous injuries suggestive of recent child abuse.

21  Defendant told police the injuries were accidental. Evidence was admitted at trial that the coroner

22  discovered during the autopsy older partially healed injuries that had occurred six to seven weeks

23  before the child's death. *Id.* at 65. Evidence of the older injuries was introduced to prove

24  "battered child syndrome," which "exists when a child has sustained repeated and/or serious

25

26  ───────────────────

    [12] Similar in function to Federal Rule of Evidence 403, California Evidence Code section 352

27  provides: "The court in its discretion may exclude evidence if its probative value is substantially
    outweighed by the probability that its admission will (a) necessitate undue consumption of time or

28  (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the
    jury."

United States District Court
For the Northern District of California

injuries by nonaccidental means." *Id.* at 66.   The state appellate court had held that the proof of

prior injuries tending to establish battered child syndrome was proper under California law.   *Id.*   In

federal habeas proceedings, the Ninth Circuit found a due process violation based in part on its

determination that the evidence was improperly admitted under state law.   *Id.* at 66-67.   The U.S.

Supreme Court first held that the Ninth Circuit had erred in inquiring whether the evidence was

properly admitted under state law because "'federal habeas corpus relief does not lie for errors of

state law.'"   *Id.* at 67.   The Supreme Court then explained:

> The evidence of battered child syndrome was relevant to show
> intent, and nothing in the Due Process Clause of the Fourteenth
> Amendment requires the State to refrain from introducing relevant
> evidence simply because the defense chooses not to contest the
> point. [¶] Concluding, as we do, that the prior injury evidence was
> relevant to an issue in the case, we need not explore further the
> apparent assumption of the Court of Appeals that it is a violation of
> the due process guaranteed by the Fourteenth Amendment for
> evidence that is not relevant to be received in a criminal trial. We
> hold that McGuire's due process rights were not violated by the
> admission of the evidence. *See Spencer v. Texas*, 385 U.S. 554, 563–
> 564, 87 S.Ct. 648, 653–654, 17 L.Ed.2d 606 (1967) ("Cases in this
> Court have long proceeded on the premise that the Due Process
> Clause guarantees the fundamental elements of fairness in a criminal
> trial . . . . But it has never been thought that such cases establish this
> Court as a rulemaking organ for the promulgation of state rules of
> criminal procedure").

*Estelle v. McGuire*, 502 U.S. at 70 (omission in original).

The cited case, *Spencer v. Texas*, 385 U.S. at 563, held that the admission of evidence of

prior convictions did not violate due process.   The Supreme Court explained in *Spencer* that,

although there may have been other, perhaps better, ways to adjudicate the existence of prior

convictions (e.g., a separate trial on the priors after the trial on the current substantive offense

resulted in a guilty verdict), Texas' use of prior crimes evidence in a "one-stage recidivist trial"

did not violate due process.   *Id.* at 563-64.   "In the face of the legitimate state purpose and the

long-standing and widespread use that attend the procedure under attack here, we find it

impossible to say that because of the possibility of some collateral prejudice the Texas procedure

is rendered unconstitutional under the Due Process Clause as it has been interpreted and applied in

our past cases."   *Id.* at 564.

1         *Estelle v. McGuire* also cited to *Lisenba v. California*, 314 U.S. 219, 228 (1941), in

2 support of the conclusion that the introduction of the battered child syndrome evidence did not so

3 infuse the trial with unfairness as to deny due process of law. *See Estelle v. McGuire*, 502 U.S. at

4 75. In *Lisenba*, the Supreme Court rejected a claim that the admission of inflammatory evidence

5 violated the defendant's due process rights. The evidence at issue in *Lisenba* was live rattlesnakes

6 and testimony about them to show they had been used by the defendant to murder his wife. "We

7 do not sit to review state court action on questions of the propriety of the trial judge's action in the

8 admission of evidence. We cannot hold, as petitioner urges, that the introduction and identification

9 of the snakes so infused the trial with unfairness as to deny due process of law. The fact that

10 evidence admitted as relevant by a court is shocking to the sensibilities of those in the courtroom

11 cannot, for that reason alone, render its reception a violation of due process." *Lisenba*, 314 U.S. at

12 228-29.

13         These three Supreme Court cases declined to hold that the admission of prejudicial or

14 propensity evidence violates the defendant's due process rights. No Supreme Court cases since

15 *Estelle v. McGuire* have undermined the holdings in these three cases. In other words, there is no

16 Supreme Court holding that the admission of prejudicial or propensity evidence violates due

17 process.

18         When the U.S. Supreme Court "cases give no clear answer to the question presented, let

19 alone one in [the petitioner's] favor, 'it cannot be said that the state court unreasonabl[y] appli[ed]

20 clearly established Federal law.' . . . Under the explicit terms of § 2254(d)(1), therefore, relief is

21 unauthorized." *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (second and third alterations in

22 original) (quoting *Carey v. Musladin*, 549 U.S. 70, 77 (2006), and 28 U.S.C. § 2254(d)(1)).

23         The Supreme Court has established a general principle of "fundamental fairness," i.e.,

24 evidence that "is so extremely unfair that its admission violates 'fundamental conceptions of

25 justice'" may violate due process. *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting

26 *United States v. Lovasco*, 431 U.S. 783, 790 (1977) (due process was not violated by admission of

27 evidence to identify perpetrator and link him to another perpetrator even though the evidence also

28 was related to crime of which defendant had been acquitted)). Thus, the court may consider

United States District Court
For the Northern District of California

1  whether the evidence was "so extremely unfair that its admission violates 'fundamental

2  conceptions of justice.'" *Id.*

3        In this circuit, the admission of prejudicial evidence may make a trial fundamentally unfair

4  and violate due process "[o]nly if there are no permissible inferences the jury may draw from the

5  evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).  "Evidence introduced by

6  the prosecution will often raise more than one inference, some permissible, some not; we must

7  rely on the jury to sort them out in light of the court's instructions.  Only if there are

8  *no* permissible inferences the jury may draw from the evidence can its admission violate due

9  process.  Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'

10  Only under such circumstances can it be inferred that the jury must have used the evidence for an

11  improper purpose." *Jammal*, 926 F.2d at 920 (internal citation and footnote omitted).[13]

12       Here, Mr. Khek does not show that the admission of the photo meets the very demanding

13  standard of being so extremely unfair that its admission violates fundamental conceptions of

14  justice.  There were permissible inferences that could be drawn from the photo, as the prosecutor

15  had argued.  Most importantly, the photo supported the inference that the stabbing was done with

16

17  _____

[13] In *Jammal*, the police found a gun, $47,000 and drugs in the trunk of Jammal's stolen car when
18  they arrested Willis, who had stolen Jammal's car; 18 months later, the police found $135,000 (but
no drugs) in the trunk of Jammal's car when they arrested Jammal.  At trial, Willis said he had no
19  idea the drugs and money were in the trunk of Jammal's stolen car until police opened it.  The
prosecution urged the jury to infer that both the drugs and the $47,000 found in the trunk of
20  Jammal's car when Willis was arrested belonged to Jammal since Jammal later was arrested also
with a large stash of cash in his trunk.  Jammal unsuccessfully objected that this evidence
21  effectively branded him a drug dealer and was therefore inadmissible character evidence. The
Ninth Circuit explained that state law evidence rules were beside the point in a federal habeas
22  proceeding and any problem in the jury inferring that Jammal had put the $47,000 and drugs in the
car earlier (even if impermissible under state law) was not a constitutional problem because the
inference that Jammal had put both the $47,000 and drugs in the trunk on an earlier occasion was a
23  "rational inference" the jury could draw from the evidence that he was caught with $135,000 in his
trunk.  *Jammal*, 926 F.2d at 920.

24
       *Jammal* is one of the few cases that gives any guidance as to what might amount to the
25  introduction of evidence that might amount to fundamental unfairness.  The Ninth Circuit
continues to use the *Jammal* "permissible inference" test in habeas cases governed by the AEDPA.
26  *See, e.g., Noel v. Lewis*, 605 F. App'x 606, 608 (9th Cir. 2015) (admission of gang evidence did
not violate due process); *Lundin v. Kernan*, 583 F. App'x 686, 687 (9th Cir. 2014) (citing *Jammal*
27  and concluding that admission of graffiti evidence did not violate due process because there were
permissible inferences to be drawn); *Gonzalez v. Knowles*, 515 F.3d 1006, 1011 (9th Cir. 2008)
28  (citing *Jammal* and concluding that evidence of prior bad acts did not violate due process).

United States District Court
For the Northern District of California

the intent to kill, rather than an intent to only injure the victim.  Unlike the testimonial description of the autopsy results, the photo starkly conveyed the brutality of the stabbing.  As the prosecutor argued, intent was not a minor or collateral issue in this case, RT 615; withholding the photo from the jury might lead the jury to think it was a minor abdominal wound that just happened to result in death at a later time, and that would give the jury a distorted view of the severity of the stabbing.  *See* RT 614.  The prosecutor's concern was valid, as confirmed by the defense closing argument that urged, in part, that the stabbing was done in a manner calculated not to kill the victim.  Mr. Khek's attorney argued in closing:  "And he stabbed him.  In the heart?  No.  In the lower part of his stomach on the right-hand side away from the heart.  And he slashed his shoulder.  On these facts Kosal Khek guilty of second degree murder.  The question for you is did he intend to injure him, to hurt him by stabbing him?  Or did he have an intention to kill him?"  RT 2990 (error in source); *see also* RT 2995 ("He chose a knife.  He chose to stab him away from the heart in the lower stomach.")  Defense counsel also urged in his closing argument that the instant messages could be explained as tough talk by teenagers trying to fit in with their gang peers, *see* RT 2992; that stabbings are not always fatal, RT 2988; that Mr. Khek "intended to hurt" the victim, RT 2994, 2998; that Mr. Khek chose to use a knife instead of a gun because people could survive stabbings, RT 2994; and that Mr. Khek was "remorseful for the unintended consequences of his desire to hurt and to stab and to injure" the victim, RT 2998-99.

As the state appellate court explained, the photo was relevant to show "the nature and brutality of the wounds, which illustrated the People's theory that the killing was intentional rather than an assault gone awry and [to illustrate] the pathologist's testimony about the severity of the injuries."  Cal. Ct. App. Opinion at 6.  The jury could draw the inference from the photo that Mr. Khek stabbed the victim with the intent to kill him.  Because this inference is permissible, the state appellate court did not unreasonably apply Supreme Court authorities in holding that the admission of the photo did not violate due process.  *See Jammal*, 926 F.2d at 920.  *See, e.g., Thornburg v. Mullin*, 422 F.3d 1113, 1128, 1129 (10th Cir. 2005) (no due process violation where petitioner challenged the admission of six photographs "depicting the charred remains of the victims' bodies"; despite the fact that the petitioner did not dispute the manner of death, "the state

41

1  still bore the burden to convince the jury that its witnesses, both eyewitnesses and experts,

2  provided an accurate account of events"); *Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005)

3  (gruesome photos were probative of state's theory that petitioner meticulously dissected victim

4  and did not act in a blind rage); *Willingham v. Mullin*, 296 F.3d 917, 928–29 (10th Cir. 2002)

5  (denying claim that the admission of 22 photos of the murder victim's body was so unduly

6  prejudicial as to render his trial fundamentally unfair, where photos were relevant to issue of

7  intent); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1032 (9th Cir. 1997) (admission of "admittedly

8  gruesome photos of the decedent" did not "raise[] the specter of fundamental unfairness such as to

9  violate federal due process of law"); *Villafuerte v. Lewis*, 75 F.3d 1330, 1343 (9th Cir. 1996) (no

10  due process violation in admission of photos "depicting blood at the crime scene, the wrapping of

11  the victim's head, and the bindings on the victim" -- the photos "were relevant to the charge of

12  dangerous kidnapping," i.e., to prove that defendant "knowingly restrained the victim, with the

13  intent to kill, injure, rape, or frighten her").

14      Mr. Khek calls the evidence speculative. He is wrong. He does not dispute that the photo

15  accurately depicted the condition of the victim's body at the crime scene, and the protruding

16  intestines were from the stabbing rather than from any work done on him by emergency or

17  medical personnel. Moreover, contrary to Mr. Khek's assertion, the prosecutor's arguments at the

18  *in limine* hearing regarding inferences that the jury could draw from the photo, were not evidence

19  – speculative or otherwise. The prosecutor's closing arguments asking the jury to draw inferences

20  from the photo (e.g., that Mr. Khek had seen the intestines protruding from the wound) did not

21  make the photo itself speculative in nature. The trial court instructed the jury that counsel's

22  arguments were not evidence, *see* CT 2551, and the jury is presumed to have followed that

23  instruction. *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985) ("The Court presumes that

24  jurors, conscious of the gravity of their task, attend closely the particular language of the trial

25  court's instructions in a criminal case and strive to understand, make sense of, and follow the

26  instructions given them.")

27      "[E]valuating whether a rule application was unreasonable requires considering the rule's

28  specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-

United States District Court
For the Northern District of California

by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).   Bearing in mind the extremely general nature of the Supreme Court's articulation of a principle of "fundamental fairness" – i.e., evidence that "is so extremely unfair that its admission violates 'fundamental conceptions of justice'" may violate due process, *see Dowling*, 493 U.S. at 352 – the California Court of Appeal's rejection of Mr. Khek's due process claim was not contrary to or an unreasonable application of clearly established federal law as set forth by the Supreme Court.  *See generally Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (denying writ because, although Supreme Court "has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." (internal citation omitted)).

## E.    No Certificate of Appealability

A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in which "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling" as to the first claim.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). And, as to the second claim, this is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.* Accordingly, a certificate of appealability is **DENIED**.

## VI.    CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated: January 22, 2016

_____
EDWARD M. CHEN
United States District Judge